CHARLES S. LINCOLN, executor, *vs.* COMMONWEALTH.

Suffolk.   January 17, 1895. — October 17, 1895.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.   ·

*Land Damages — Metropolitan Sewerage Act — Taking — Future Damages — Evidence — Report of Engineer — Division of Land by Way — Special Damages to remaining Land — Rental Value of Land.*

When the Legislature authorizes something to be done in the neighborhood of a person's land which diminishes its value, but which would not be actionable at common law if done by a neighboring owner, if the statute provides no compensation, the owner of the land cannot claim any under the Constitution, because what is done does not amount to a taking; and even if the thing authorized would be actionable at common law and a nuisance but for the statute, still it is not necessarily a taking. KNOWLTON & MORTON, JJ., dissenting.

If land adjoining that taken by the Metropolitan Sewerage Commissioners, under St. 1889, c. 439, for the construction of a sewer, and owned by the same person, is diminished in value by such taking, the owner is entitled to recover damages therefor; and, in estimating the damages, the jury may take into consideration the probable future consequences of the proximity of the sewer.

At the trial of a petition for an assessment of damages, under St. 1889, c. 439, for the taking by the Metropolitan Sewerage Commissioners of land for the construction of a sewer, an item for "sand sump and overflow" at the petitioner's premises, in the estimate of cost of the sewerage system by the engineer in his report attached to the report of the State board of health, which latter report is adopted and made the foundation of the statute, and which approves the estimate, is admissible in evidence.

Although the uncontradicted testimony of the engineer, at the trial of a petition for an assessment of damages, under St. 1889, c. 439, for the taking by the Metropolitan Sewerage Commissioners of land for the construction of a sewer, shows that the original plan of constructing an overflow there had been changed, the truth of which testimony is assumed in the charge to the jury, the respondent is not entitled to a ruling that there was no evidence that the construction of an overflow on the land taken was necessary or reasonably probable, but the jury have a right to form an independent opinion upon the matter.

At the trial of a petition for an assessment of damages, under St. 1889, c. 439, for the taking by the Metropolitan Sewerage Commissioners of land for the construction of a sewer, the respondent has no ground of exception to the refusal to rule that there was no evidence that the uses for which the land was taken were inconsistent with the laying out of a way over the same "by the proper authorities."

If land is taken by the Metropolitan Sewerage Commissioners for the construction of a sewer, the mere fact that a portion of the remaining land of the owner is separated from that taken by a way legally established, but not visible on the surface of the ground, is not conclusive against his right to recover for damages

to such portion, but if the whole estate is practically one he is entitled to have the damage to the whole of it considered.

Such damages only to the remaining land of a person, by reason of the use to which land taken from him for the construction of a public sewer is to be put, as do not result to all the land in that locality, are recoverable.

The owner of land taken for the construction of a public sewer is qualified to testify to the rental value of the property; and such rental value may be stated as a means of arriving at the value of the land.

PETITION to the Superior Court, for a jury to assess the damages of the petitioner's testator, Orray A. Taft, for the taking by the Board of Metropolitan Sewerage Commissioners, in behalf of the Commonwealth, under St. 1889, c. 439, of a triangular parcel of land at Point Shirley, in Winthrop, containing about 12,450 square feet of upland and 9,000 feet of beach, for the purpose, expressed in the instrument of taking, which was recorded on April 30, 1890, of using the same " for the construction, maintenance, and operation of an underground sewer, or sewers, syphons, gate-chambers, and necessary appurtenances."

After the former decision, reported 158 Mass. 526, (*Taft* v. *Commonwealth*,) the case was tried in the Superior Court, before *Bond*, J., who allowed a bill of exceptions, in substance as follows.

At the time of the taking, the premises to low-water mark were owned by the petitioner's testator, Orray A. Taft, who died after the first verdict upon this petition, and before the decision in 158 Mass. 526.

The plan printed in that case may be referred to for the purpose of showing the triangle taken, the way in controversy, and the hotel and remaining land belonging to the estate of the petitioner's testator.

The petitioner's testator had owned since 1853, and controlled since 1848, a parcel of land containing about twelve acres, bounded on all sides but one by the salt water, and the extreme end being the northerly shore of Shirley Gut, with Deer Island on the other side. This land was flat and even, with sandy soil, with no trees, fences, or buildings upon it except the buildings used by the petitioner's testator as a hotel, with its yard, stables, and outbuildings. At the time of the taking there was a way, without fences at the side, which extended from a point on what was conceded by both parties to be Shirley Street, through land of one Hale, formerly of the Revere Copper Company, and

thence in a straight line through the land of the petitioner's testator to his hotel, the corner of which was within about two hundred and twenty-five feet of the high-water mark at Shirley Gut. The judge ruled that the way in question was a public way.*

The respondent contended, and offered evidence to show, that the value of the land taken was from $500 to $1,500; and that there was no damage to the remaining land not taken.

J. M. Meredith, a witness called by the petitioner, was asked the following question:

" Leaving out of account the buildings, and assuming that there is a public street, 33 feet wide and 1,000 long, through the premises, past the corner of the hotel, what in your judgment was the value of the entire property the 30th of April, 1890, before any taking by the Commonwealth?"

The respondent objected to this question, upon the ground that the value of the parcel of land on the opposite side of the public street from the triangular parcel taken was incompetent and immaterial, but the objection was overruled, and the witness answered, " I have always considered that property would have brought $35,000." The respondent excepted.

The testimony of the petitioner's testator, given at the previous trial, was read by the petitioner; and the respondent excepted to the admission of certain questions and answers as to the rental value of the property, which the witness testified to be $10,000 a year in 1890 and 1891.

No evidence of his qualifications as an expert, other than his long ownership and occupation of the property, was introduced.

The petitioner read in evidence certain portions of the report of the State board of health to the Legislature of 1889.

The petitioner also put in evidence the plan of the North Metropolitan Sewerage System, showing the territory embraced; also a portion of the report of Howard A. Carson, civil engineer, to the State board of health, which was appended to the above mentioned report of the State board of health.

The petitioner also read in evidence, from the table of estimates in the report of Carson, the following words: "Sand sump

---

* This ruling is in accordance with that made in the other case between the same parties, and sustained by this court. See *ante,* 1.

and overflow, Shirley Gut"; and to the admission of these words the respondent excepted.

The respondent requested the judge to instruct the jury as follows:

" 1. There is no evidence that the construction of an overflow on the land taken is necessary or reasonably probable. 2. There is no evidence that there will be any noise or smoke for which the petitioner may recover damages in this proceeding. 3. The jury are not to consider the possibility of a nuisance resulting from the sewerage works. 4. There is no evidence that any of the purposes for which the land taken may be used will injuriously affect the use of the remaining land for the business of a hotel, as it was used before the taking. 5. The jury should not include in their verdict any damage to the remaining land on account of the uses to which the land taken may be put. 6. The jury should not consider offensive smells as enhancing damages even if not so offensive as to cause a nuisance. 7. There is no evidence that the uses for which the land was taken are inconsistent with the laying out by the proper authorities of a road or way over the same. 8. The land on the opposite side of the public street cannot be considered as part of the remaining land of the petitioner, for damage to which he can recover in this proceeding. 9. If there is any damage to such land, it is of a kind common to the neighborhood, and not peculiar to the petitioner."

The judge refused to give any of the above instructions, except the third; and instructed the jury, among other things, as follows:

" There has been some controversy here between the parties as to whether it [the property] is to be used for an overflow, as that has been described to you. And it seems that at a time in 1889, before this taking, there had been a scheme which had been prepared by the engineers and reported by the officers of the Commonwealth which contemplated the use of that piece for an overflow. But taking the testimony of the engineer who has had this matter in charge, who has attended to the construction of the sewer, that that plan of constructing an overflow as it was first described has been departed from, and that no overflow has been constructed, and that it is not now the plan of the

parties who have it in charge to make any such construction there, to consider any overflow, yet if in the future such an overflow should be needed in the opinion of those who have it in charge at such time, there is the right taken to construct such an overflow. It is not a mere possibility that in the future it may be constructed that you are to consider, because you might concede that anything was possible with reference to it in the sense that I use that term; but you are to determine upon the evidence what use is reasonably to be expected with reference to this tract in the future. . . . The difficulty is in a case like this to determine just what elements are to be considered by you in this matter of the depreciation of the value of the remaining land. . . . What are the elements that ought to be considered? What is the annoyance to that remaining property? Can it be put into words in any way that you can see what it is, and just what you should consider with reference to it?

" One suggestion is that the appearance of these structures which are made or which may be made upon this property in the future, as you shall determine that fact, will be unsightly, will be objectionable to people who would otherwise buy property, and they will go away from it on that account. Determine then what is the nature of the structures that are to be there. . . . And of course you ought to try to determine as well as you can from what you saw, and from the testimony which has been introduced here, what will be about the appearance of the property when it is completed upon the plan that it is being constructed with reference to now, and then what change will be made in the appearance there in the future, any future use that you are satisfied will be made of it, reasonable for its purposes. Will there be anything there that will be unsightly, that will be objectionable to people? If so, determine what that is, and then see if there are any other elements that you can determine which ought to be considered.

" Another suggestion is that there may be odors from the operation of such structures as are there now, or such as may be put there in the future, as will be put there in the future, not amounting to a nuisance, not amounting to anything detrimental to health or to the comfort of persons living in that locality, or to render their habitations unhealthy and uncomfortable, yet

may be such that people will so object to them that they will not buy property in that locality. . . . Then, if you are satisfied that an overflow is to be constructed there at some time, what will be the effect of that? not as creating a nuisance there, because that is not to be considered by you, but in this other way; not amounting to a nuisance, and yet so objectionable that people will not purchase property in that locality.

" Then there is another suggestion: not that an overflow is to be built, not necessarily that any change is to be made in the structures in this locality for the purposes of this work that is to be carried on, but that there does exist the right to make some changes, and that the fear that there will be changes made, people do not know what and do not know when, but that that right existing there will deter people from going to that locality and purchasing property there, and that that dread or fear on the part of people who would otherwise purchase would lead them to go elsewhere and purchase property in another locality rather than to purchase it here; — all of this, you see, affects the demand, and the demand has to do with the value of this remaining property.

" Determine as well as you can just what the fact will be, as to what will be done there, what the effect of the work will be, what is to be feared with reference to that, what view would people take of that. You have had there the opinion of witnesses with reference to it, some saying that in their opinion that would affect it, and others that it would not. In the first place there is the question how far any of these elements are to be considered by you, whether they are any elements, either of them, one or another of them, as I have suggested, that are elements of damage for you to consider with reference to this remaining property. . . .

" If the petitioner sustains other and different damages to his remaining land, by reason of the use to be made of the land taken from him, than he would have sustained if the land had been taken from another and adjoining his, or so near his land, such additional damages, such other and different damages sustained by him by reason of the taking at that place, may be assessed in connection with the value of the land taken there. In other words, it is not to assess the damages resulting to the

remaining land from these different elements that occur to all the land in that locality, but it is the difference between some annoyance which is outside the petitioner's original parcel and the same in its intended place which is the measure of damages; it is the difference between the two, if there is any; if there are other and additional damages, because of the tract being taken there where it is taken, to the remaining land, it is that increase, that difference, that is to be assessed. You will not assess the damages to the remaining land, or the depreciation in value of the remaining land, resulting to all of the land in that locality whether the property is taken from the petitioner or some one else. And it is upon that theory that you ought to assess the damages and depreciation to this remaining land; adding that, whatever you may find that to be, to the value of the land as you find that to be, the value of the land taken, the triangular piece."

The jury returned a verdict for the petitioner in the sum of $15,262.50, and found specially that the damage to the remaining land of the petitioner not taken was $10,000.

The respondent alleged exceptions.

The case was argued at the bar in January, 1895, and afterwards was submitted on the briefs to all the judges.

*W. D. Turner*, for the Commonwealth.

*S. J. Elder*, (*E. A. Whitman* with him,) for the petitioner.

HOLMES, J. This case brings before us once more the question of the rule of damages to be applied when land is taken and the purpose for which it is taken is such that adjoining land of the same owners is made less in value. The matter was discussed in the former decision of this case, but we will state our views once more in the hope of making them somewhat clearer.

When the Legislature authorizes something to be done in the neighborhood of a plaintiff's land which diminishes its value, but which would not be actionable at common law if done by a neighboring owner, if the statute provides no compensation the plaintiff cannot claim any under the Constitution, because what is done does not amount to a taking. And even if the thing authorized would be actionable at common law and a nuisance but for the statute, still it is not necessarily a taking, and unless it does amount to that no compensation can be recovered if the

statute does not give it. *Titus* v. *Boston*, 161 Mass. 209. See *Bacon* v. *Boston*, 154 Mass. 100, 102; *Caledonian Railway* v. *Ogilvy*, 2 Macq. 229, 235 ; *Ricket* v. *Metropolitan Railway*, L. R. 2 H. L. 175, 187. If what is done does amount to a taking, of course, if the statute gives no compensation, an action can be maintained, since the Legislature cannot authorize property to be taken without being paid for.

The question what the statute gives compensation for is a matter of construction. But as the phraseology is likely to be somewhat general, it is desirable that a general rule should be applied. Such a rule exists in England, but under our decisions there are difficulties which are mentioned in *Stanwood* v. *Malden*, 157 Mass. 17, and *Taft* v. *Commonwealth*, 158 Mass. 526, 547, 548. In the former of these cases the English rule is stated a little too broadly. 157 Mass. 18. One thing seems pretty clear, however, and that is that, if the damages complained of would be a nuisance but for the statute, a court should be more ready to find a remedy under the act than in a case of *damnum absque injuria* at common law. We mention this because the contrary assumption seems to be made in the third and sixth requests of the respondent, the former of which was given by the court. If the nuisance, instead of being a necessary consequence of what the act allows, is a result of mismanagement, the case is different. *Badger* v. *Boston*, 130 Mass. 170.

Statutes like the present, which contemplate a taking of land, generally do not provide for compensation unless there is a taking, and therefore in proceedings under the act some of the petitioner's land must have been taken in order to give him a standing in court. Whether this is just or not, so long as it is within the limits of the Constitution, is not for us to consider. It is enough for us that this condition generally is found in the words of the act. See *Rand* v. *Boston*, *ante*, 354. If, however, a part of the petitioner's land has been taken, his *locus standi* is established, and the question of construction just referred to arises, as to what, if any, damages shall be allowed for the harm to his adjoining land. Assuming that none of the damages claimed could be recovered under the act but for the taking, one naturally asks why the taking of adjoining land should make a difference. The question has been asked a great

many times, and the difficulty will be found forcibly stated by
Lord Esher, in *The Queen* v. *Essex*, 17 Q. B. D. 447, 452. If
such a difference is to be made, the foundation for it must be
found in the words of the statute. It may be said, to be sure,
that the petitioner gets no more than justice even if others get
less; and that when he is compelled to sell the land we ought
to consider all that he naturally would consider in fixing the
price for a voluntary sale. See *Blesch* v. *Chicago & Northwest-
ern Railway*, 48 Wis. 168, 189 ; *Cowper Essex* v. *Local Board
for Acton*, 14 App. Cas. 153, 177. A suggestion has been made
that the injurious affecting of the petitioner's land by the use
of the land taken, as distinguished from the construction of the
works, is a particular injury different in kind from that which
is suffered by the rest of the world. *Cowper Essex* v. *Local Board
for Acton*, 14 App. Cas. 153, 161, 162. But the distinction re-
mains a somewhat arbitrary one. The case in which it was laid
down under the English statutes, *In re Stockport, Timperley,
& Altringham Railway*, 33 L. J. (N. S.) Q. B. 251, was criticised
often before it finally was accepted, although there is no doubt
that now it is settled law. *The Queen* v. *Essex*, 17 Q. B. D. 447 ;
*S. C. sub nom. Cowper Essex* v. *Local Board for Acton*, 14 App.
Cas. 153, 162, 164, 169, 173, 178. And it is to be noticed that
Lord Westbury, Lord Bramwell, and some other judges, vainly
insisted, with a good deal of energy, that the language of the
statutes allowed similar compensation when no land was taken,
even if at common law there would have been no right of action.
*Ricket* v. *Metropolitan Railway*, L. R. 2 H. L. 175, 202. *Cowper
Essex* v. *Local Board for Acton*, 14 App. Cas. 153, 170 ; *S. C.*
17 Q. B. D. 447, 450. *Buccleuch* v. *Metropolitan Board of Works*,
L. R. 5 H. L. 418, 461. *Hammersmith & City Railway* v. *Brand*,
L. R. 4 H. L. 171, 215 *et seq.*

Some damages are allowed by our decisions which could not
be suffered except by reason of the taking. The lot from which
a part is taken is considered as one whole, as it is in England.
*Maynard* v. *Northampton*, 157 Mass. 218. A disadvantageous
change in the shape or size of what remains clearly is a matter
for compensation. And the principle which warrants such
allowances was held logically enough in *Walker* v. *Old Colony &
Newport Railway*, 103 Mass. 10, 15, to extend to considering

depreciation of value arising from the proximity of a railroad and the running of trains "so far as it is due to proximity secured by means of taking a part of the petitioner's land, and would not have resulted but for such taking," although it is settled that similar depreciation would not be paid for if no land had been taken. *Presbrey* v. *Old Colony & Newport Railway*, 103 Mass. 1. *Fay* v. *Salem & Danvers Aqueduct*, 111 Mass. 27. *Sawyer* v. *Davis*, 136 Mass. 239, 242. *Taft* v. *Commonwealth*, 158 Mass. 526, 547. *Rand* v. *Boston, ubi supra.* This rule is narrower than that laid down in the Wisconsin and English cases, and if it is open to the objection that it is hard to apply and too refined for practical purposes, at least it has the advantage of cutting down and in theory of doing away with the anomaly which those cases recognize. To that extent the damage could not have been suffered but for the taking of the petitioner's land, whereas for similar works just outside the petitioner's land he could not have recovered in the case supposed, either at common law or by the Constitution. The rule laid down gives the damages, but only the damages due to the taking of the petitioner's land. It is true that the works might not have been constructed at all if they had not been put where they were, but this consideration is met by the fact that, if they had been constructed just outside his land, the petitioner would have suffered no wrong under the Constitution, or at common law if no statute had been passed, and would have had no remedy under the statute. At all events, the Massachusetts rule has been in force too long now to be questioned. It has been repeated in many cases, and recently was acted on in the former decision of the case at bar. *Taft* v. *Commonwealth*, 158 Mass. 526, 548. *Drury* v. *Midland Railroad*, 127 Mass. 571, 583, 584. *Johnson* v. *Boston*, 130 Mass. 452, 454. *Pierce* v. *Drew*, 136 Mass. 75, 85. *Cassidy* v. *Old Colony Railroad*, 141 Mass. 174, 178. *Wellington* v. *Boston & Maine Railroad*, 158 Mass. 185, 189. *Titus* v. *Boston*, 161 Mass. 209, 212.

The statute under which these proceedings took place requires the Commonwealth to pay "all damages that shall be sustained by any person or corporation by reason of such taking." St. 1889, c. 439, § 4 (amended after the present taking by St. 1890, c. 270). It is enough to say that these words certainly

do not look to any diminution of the liability for taking as it was construed by the decisions rendered before the passage of the act.    The Commonwealth had nothing to complain of in the general tenor of the instructions to the jury.

The respondent suggests that harm anticipated from the future use of the sewer cannot be allowed for under the head of damages caused by the taking.    Some of the difficulties hinted at in our former decision, 158 Mass. 549, are stated more at length by the Lord Chancellor in *Cowper Essex* v. *Local Board for Acton*, 14 App. Cas. 153, but the discussion there brings out plainly what any one who considers the matter must see, that it is impossible to draw a sharp line between the present and anticipations of the future.    All values are anticipations of the future. If a jury is of opinion that the proximity of a sewer has a detrimental effect similar to that of the proximity of the railroad in *Walker* v. *Old Colony & Newport Railway*, it may allow for it within the limits stated, on the same grounds as in Walker's case. It is true that a jury ought not to speculate on the mere possibility that land may be put to disagreeable uses.    But when land is taken and must be used for a particular purpose, the reasonably probable consequences of a lawful use for that purpose must be taken into consideration.    See *First Parish in Woburn* v. *Middlesex*, 7 Gray, 106, 109 ; *In re London, Tilbury, & Southend Railway*, 24 Q. B. D. 326, 330, 331 ; *Cowper Essex* v. *Local Board for Acton*, 14 App. Cas. 153, 178.

The foregoing general considerations meet a part of the argument addressed to us on behalf of the Commonwealth.    It remains for us to deal with the exceptions specifically so far as they need mention.    The first ruling requested was that there was no evidence that the construction of an overflow on the land taken was necessary or reasonably probable.    In connection with this may be mentioned an exception to the admission of the item for " sand sump and overflow, Shirley Gut," in the estimate of cost of the North Metropolitan Sewerage System by the engineer, Carson, in his report attached to the report of the State board of health, which latter is adopted and made the foundation of the act of 1889, under which these proceedings take place.    St. 1889, c. 439, § 3.    The report approves the estimate of Carson, and appends his report.    We see no reason why

the document was not admissible.   But the testimony was uncontradicted that the plan had been changed in this particular, and the truth of this testimony practically was assumed by the judge in his charge.   If the jury were to find that the possibility of an overflow on the land taken was an element to be considered, they hardly could have done so except on the ground that in their opinion it was a probable or not improbable consequence of the general scheme as presented to them by the evidence and their view, whatever the engineers might say.   They had a right to form their own opinion upon the matter, and if that was their opinion they had a right to act upon it, even if every expert assured them that nothing of the kind was to be expected, since such a use of the land was within the rights taken by the Commonwealth.

Nothing further needs to be said as to the second, third, fourth, fifth, and sixth requests.   We do not see anything in the case calling for the seventh ruling asked, that there was no evidence that the uses for which the land was taken were inconsistent with the laying out of a way over the same " by the proper authorities."   No doubt the Legislature could authorize such a way.   The request did not require any more exact proposition.   We perceive no advantage which the Commonwealth would have gained from having that statement made.

The eighth ruling asked was that the land on the opposite side of the public street could not be considered as part of the remaining land of the petitioner, for damages to which he could recover in this proceeding.   No doubt there are many cases in which the court is able to see, from the way in which they are divided and used, that different parcels of land, even if they adjoin one another, are to be regarded as distinct.   *Wellington* v. *Boston & Maine Railroad,* 158 Mass. 185.   *Todd* v. *Kankakee & Illinois River Railroad,* ·78 Ill. 530.   But the question is a practical one, and the mere intervention of a way legally established, but not visible on the surface of the ground, is not conclusive.   If, as here, the whole estate was practically one, the petitioner is entitled to have the damage to the whole of it considered.   As was said by Dixon, C. J., we are to look at the land, and not at the map, to ascertain the plaintiff's damages.   *Welch* v. *Milwaukee & St. Paul Railway,* 27 Wis. 108, 112.

*Kansas City, Emporia, & Southern Railroad* v. *Merrill,* 25 Kans. 421, 423. *Ham* v. *Wisconsin, Iowa, & Nebraska Railway,* 61 Iowa, 716. *St. Paul & Sioux City Railroad* v. *Murphy,* 19 Minn. 500. *Cowper Essex* v. *Local Board for Acton,* 14 App. Cas. 153, 162, 167. *Whitney* v. *Boston,* 98 Mass. 312, 316.

Nothing needs to be added concerning the ninth request, in view of the instructions given. The only other exception was to the admission of the testimony of Taft, the owner, as to the fair rental value of the property. As an owner, he was qualified to testify as to the value. *Blaney* v. *Salem,* 160 Mass. 303. And the rental value may be stated as a reason for, or as a means of, arriving at the value of the land.          *Exceptions overruled.*

Justices KNOWLTON and MORTON agree to the result in this case, but dissent from some parts of the reasoning for reasons that appear in the dissenting opinion in *Rand* v. *Boston, ante,* 354.